1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ARECELY GAMEZ, et al., *on behalf of*          No.  23-cv-01464-DAD-KJN
     *themselves and all others similarly*
12   *situated,*

13              Plaintiffs,                          ORDER DENYING IN PART AND
                                                     GRANTING IN PART DEFENDANTS'
14        v.                                         MOTION TO DISMISS PLAINTIFFS' FIRST
                                                     AMENDED COMPLAINT, WITH LEAVE TO
15   TOYOTA MOTOR SALES, U.S.A., INC.                AMEND.
     et al.,
16                                                   (Doc. No. 13)
                Defendants.
17

18

19          This matter came before the court on December 5, 2023 for a hearing on a motion to

20   dismiss plaintiffs' first amended complaint ("FAC") filed by defendants Toyota Motor Sales,

21   U.S.A., Inc. ("TMS") and Toyota Motor North America, Inc. ("TMNA") (collectively,

22   "defendants") on September 15, 2023.  (Doc. No. 13.)  Attorney Joshua Markovits appeared by

23   video on behalf of plaintiffs and attorney Robert Herrington appeared by video on behalf of

24   defendants.  (Doc. No. 24.)  For the reasons explained below, defendants' motion to dismiss will

25   be granted in part and denied in part, with leave to amend.

26   /////

27   /////

28   /////

                                                    1

**BACKGROUND**

This is a putative class action arising from defendants' sale of 2021 Toyota RAV4 vehicles (the "Class Vehicles") equipped with allegedly defective panoramic glass sunroofs (the "Roofs") to plaintiffs Arecely Gamez and Jeffry Takili.  (Doc. No. 1 at 1.)

In their FAC, plaintiffs allege the following.  Defendants designed, manufactured, marketed, distributed, sold, and serviced the Class Vehicles.  (*Id.*)  Each Class Vehicle comes with a panoramic sunroof that is larger than typical sunroofs and covers most of the Class Vehicle's top.  (*Id.* at ¶¶ 2, 62.)  The Roofs are made out of tempered glass by shaping and cutting a piece of annealed glass that is then heated and rapidly cooled.  (*Id.* at ¶ 65.)  This tempering process creates an outer layer compressing the glass, making the final product stronger than non-tempered glass.  (*Id.*)  However, if the outer layer is compromised, the entire piece of glass shatters explosively.  (*Id.*)  Ceramic paint is applied to the glass before it undergoes tempering, which makes the glass surface very unstable.  (*Id.* at ¶¶ 66–67.)  The Roof is then fastened to the Class Vehicle.  (*Id.* at ¶ 68.)  Because the Roof is a structural part of the Class Vehicle, it is subjected to pressure and stress that weakens the glass.  (*Id.*)  Unlike some other automakers, defendants do not use laminated glass in the Roof to reduce the risk of the glass shattering.  (*Id.* at ¶ 70.)  The Roof shatters under ordinary driving conditions ("the Defect"), due to deficient materials, deficient manufacturing processes, or both.  (*Id.* at ¶¶ 5, 69.)

When the Defect manifests and the glass shatters, it distracts drivers and risks injuring passengers.  (*Id.* at ¶ 71.)  Passengers can be exposed to outside wind or water, which can also damage the Class Vehicle's electrical components and render the car undrivable.  (*Id.* at ¶ 72.)

Plaintiffs include in their FAC over a dozen purported National Highway Traffic Safety Administration ("NHTSA") complaints detailing the various safety and comfort problems caused by the Defect.  (*See, e.g.*, *id.* at 26–27.)  Several of the complaints state that the Defect, along with the loud gunshot-like sound accompanying it, nearly caused car accidents.  (*See, e.g.*, *id.* at 44, 46–47.)  Many of the complaints and pictures included in plaintiffs' FAC state or show that the resulting hole in the Roof is bent outwards towards the sky, not inwards towards the interior of the Class Vehicle.  (*See, e.g.*, *id.* at 5; ¶¶ 32, 69.)

Defendants gained knowledge of the Defect through five channels of information. (*Id.* at ¶ 74.) First, defendants test their cars on their Arizona Proving Ground, a 12,000-acre facility with 60-lane miles of paved and dirt tracks. (*Id.* at ¶ 75.) The Defect manifested during the durability testing on the Class Vehicles between 2019 and early 2020, before defendants began selling the Class Vehicles in the summer of 2020. (*Id.* at ¶ 77.) Second, Toyota dealers reported the Defect when the Roofs shattered during transportation to the dealerships, as dealers are required to report glass that is broken at the time of delivery. (*Id.* at ¶¶ 81–82.) Third, because the Roofs failed at unusually high rates compared to similar Toyota vehicles without the Roofs, the replacement part sales data collected and scrutinized by defendants reflected the unusually high frequency of the Defect. (*Id.* at ¶¶ 84–89.) Fourth, because the Defect often manifests within days or weeks of the Class Vehicle being driven, defendants began receiving consumer complaints relayed to dealers almost immediately after defendants began selling the Class Vehicles in the summer of 2020. (*Id.* at ¶¶ 90–91.) Fifth, beginning in October 2020, at least two dozen NHTSA complaints were filed regarding the Defect, many of which are included in plaintiffs' FAC, and more complaints have been lodged online on various Toyota-related third-party websites. (*See, e.g.*, *id.* at 26–31; ¶¶ 105–14.) Defendants monitor NHTSA complaints daily and monitor third-party sites for quality assurance purposes as well. (*Id.* at ¶ 99–104, 115.) Despite knowing of the Defect, defendants have continued to replace shattered Roofs with the same defective Roofs. (*Id.* at ¶ 95.)

Plaintiff Gamez purchased her Class Vehicle on September 18, 2020; plaintiff Takili bought his on December 31, 2021. (*Id.* at ¶¶ 26, 44.) Both plaintiffs reviewed the Class Vehicles' Monroney stickers[1] before purchasing their Class Vehicles, and plaintiff Takili additionally reviewed defendants' brochures and website. (*Id.* at ¶¶ 27, 45.) At no point did defendants disclose the existence of the Defect, and plaintiffs would not have bought their Class Vehicles had defendants done so. (*Id.* at ¶¶ 30–31, 48–49.) Both of plaintiffs' Class Vehicles came with defendants' "New Vehicle Limited Warranty" (the "Limited Warranty"), which covers

---

[1] A Monroney sticker is a required label displaying information about a vehicle, typically appearing on the vehicle's window at the time of its purchase.

"defects in materials or workmanship." (*Id.* at ¶¶ 28–29, 46–47.) Plaintiff Gamez's Roof shattered while she was driving on the highway in October 2020, approximately one month after she bought it; her replacement Roof exploded again on October 6, 2022. (*Id.* at ¶¶ 32, 38.) Plaintiff Takili's Roof exploded while he was driving on the highway on November 8, 2022. (*Id.* at ¶ 50.) Both plaintiffs still own and continue to use their Class Vehicles. (*Id.* at ¶¶ 43, 59.)

On July 21, 2023, defendants removed this action from Sacramento County Superior Court to this federal court. (Doc. No. 1.) Defendants moved to dismiss plaintiffs' complaint on July 28, 2023. (Doc. No. 6.) Pursuant to a stipulation by the parties (Doc. Nos. 8, 9), plaintiffs filed the operative FAC on August 25, 2023 (Doc. No. 11). In their FAC, plaintiffs assert the following seven claims against both defendants: (1) breach of implied and express warranties in violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*; (2) unjust enrichment; (3) deceptive business practices in violation of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*; (4) fraudulent, unlawful, and unfair conduct in violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*; (5) breach of implied warranty in violation of the Song-Beverly Consumer Warranty Act ("Song-Beverly"), California Civil Code §§ 1792, 1791.1, *et seq.*; (6) breach of express warranty in violation of California Commercial Code § 2313; and (7) breach of express warranty in violation of Song-Beverly, California Civil Code §§ 1793, 1791.2, *et seq.* (*Id.* at 1.)

Defendants filed the pending motion to dismiss plaintiffs' FAC on September 15, 2023. (Doc. No. 13.) Plaintiffs filed their opposition to the pending motion on October 13, 2023. (Doc. No. 17.) On November 10, 2023, defendants filed their reply thereto. (Doc. No. 23.)

## LEGAL STANDARD

### A.     Motion to Dismiss Under Rule 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901

4

F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However, the court need not assume the truth of legal conclusions cast in the form of factual allegations.  *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  It is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In ruling on a motion to dismiss under Rule 12(b)(6), the court is permitted to consider material that is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiffs' complaint necessarily relies on them, and matters of public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

**B.     Heightened Pleading Standard Under Rule 9(b)**

"When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).  Under Rule 9(b), the "circumstances constituting the alleged fraud [must] be

1    specific enough to give defendants notice of its particular misconduct . . . so they can defend

2    against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor*

3    *Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Bly-Magee*

4    *v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  To satisfy the particularity standard of

5    Rule 9(b), "a pleading must identify the who, what, when, where, and how of the misconduct

6    charged, as well as what is false or misleading about the purportedly fraudulent statement, and

7    why it is false." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 (9th Cir. 2020)

8    (quotations omitted) (quoting *Davidson v. Kimberley-Clark Corp.*, 889 F.3d 956, 964 (9th Cir.

9    2018)).  However, "[m]alice, intent, knowledge and other conditions of a person's mind may be

10   alleged generally." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404

11   (9th Cir. 2021) (quoting Fed. R. Civ. P. 9(b)); *see also Klaehn v. Cali Bamboo LLC*, No. 21-

12   55738, 2022 WL 1830685, at *2 (9th Cir. 2022)[2] ("Under Fed. R. Civ. P. 9(b), a plaintiff must

13   plead circumstances from which a court can plausibly infer the defendant's knowledge.").

14                                           **ANALYSIS**

15   **A.    Plaintiffs' Claims**

16           1.     Threshold Matters Relevant to All of Plaintiffs' Claims

17           Before turning to each claim, the court will address two arguments defendants make in

18   their pending motion that apply to all of plaintiffs' claims.  First, defendants argue that plaintiffs

19   have failed to sufficiently allege a defect of any kind in the Class Vehicles.  (Doc. No. 13 at 16.)

20   Second, defendants argue that plaintiffs' allegations fail to exclude an alternative explanation for

21   the broken glass that would result in no liability for defendants, namely that the Roofs are

22   breaking after being hit by rocks.  (*Id.* at 16–17.)

23                  a.     *Whether Plaintiffs Have Alleged a Defect in the Class Vehicles*

24           In their pending motion to dismiss, defendants argue that all of plaintiffs' claims fail

25   because plaintiffs fail to sufficiently allege any defect in the Class Vehicles.  (Doc. No. 13 at 16.)

26   "The level of factual specificity necessary to plead claims based on product defects presents a

27

28   [2]  Citation to the unpublished Ninth Circuit opinions such as those cited here and elsewhere in this
     order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   difficult question that the Ninth Circuit has not squarely addressed, and on which district courts

2   have not reached consensus." *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1115 (C.D.

3   Cal. 2021).  Generally, a complaint "must contain sufficient allegations of underlying facts to

4   give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652

5   F.3d 1202, 1216 (9th Cir. 2011).  "In the context of product defect claims, district courts in the

6   Ninth Circuit have often held that a complaint provides fair notice of the defect if it (1) identifies

7   the particular part or system affected by the defect, and (2) describes the problems allegedly

8   caused by the defect." *Sweeny v. Toyota Motor Sales, U.S.A., Inc.*, No. 22-cv-00949-SPG-JEM,

9   2023 WL 2628697, at *4 (C.D. Cal. Feb. 9, 2023) ("*Sweeny I*") (citation omitted).

10          The court finds that plaintiffs have adequately alleged a defect.  First, as plaintiffs point

11   out, the allegations in their FAC identify the particular part of the Class Vehicles affected by the

12   Defect, namely the Roofs.  (Doc. No. 17 at 9; *see also* Doc. No. 11 at ¶ 65.)  As they further point

13   out, plaintiffs allege details regarding how the tempered glass is manufactured, how ceramic paint

14   is applied before the panoramic roof glass undergoes tempering, why "[c]eramic fusion of

15   tempered glass makes the glass surface very unstable," how defendants' process for fastening the

16   Roofs to the Class Vehicles weakens the glass, and how the glass consequently shatters

17   spontaneously under ordinary driving conditions.  (Doc. Nos. 17 at 9–10; 11 at ¶¶ 65–69.)

18          Second, plaintiffs describe in their FAC the problems allegedly caused by the exploding

19   Roofs.  For instance, plaintiffs allege that the Defect distracts drivers, hinders drivers' ability to

20   drive the Class Vehicles, leaves the vehicles' occupants and electrical components exposed to the

21   outside elements, and risks injuring the vehicles' occupants.  (Doc. No. 11 at ¶¶ 71–72.)

22   Plaintiffs also include in their FAC a litany of purported NHTSA complaints detailing the various

23   safety and comfort problems caused by the Defect.  (*See, e.g.*, *id.* at 26–27.)

24          Accordingly, as indicated above, the court concludes that plaintiffs have sufficiently

25   alleged a defect in the Roofs.  *See Sweeny I*, 2023 WL 2628697, at *4; *see also Enea v.*

26   *Mercedes-Benz USA, LLC*, No. 18-cv-02792-HSG, 2019 WL 402315, at *2 (N.D. Cal. Jan. 31,

27   2019) ("Here, Plaintiff identifies a single component (the sunroof), and alleges that that

28   component will spontaneously explode. . . .  Given that the sunroof is a single component of the

1  MBUSA vehicles, and the alleged defect involves a complete failure of that component, Plaintiff

2  has plausibly alleged facts sufficient to support a defect claim.").

3              b.      *Whether Plaintiffs' Allegations Exclude Alternative Explanations*

4          Defendants argue that plaintiffs' allegations do not tend to exclude the possibility that an

5  alternative explanation is true.  (Doc. No. 13 at 16); *see also In re Century Aluminum Co. Sec.*

6  *Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (holding that plaintiffs must allege "facts tending to

7  exclude the possibility that the alternative explanation [resulting in no liability for defendant] is

8  true"); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)

9  ("When considering plausibility, courts must also consider an 'obvious alternative explanation'

10 for defendant's behavior.") (quoting *Twombly*, 550 U.S. at 567).  Specifically, defendants argue

11 that plaintiffs' allegations are facially implausible because plaintiffs ignore "the *only* plausible"

12 explanation:  "[R]oad debris impacted the glass roofs and caused the alleged damage."  (Doc.

13 No. 13 at 17.)

14         Plaintiffs' allegations in their FAC tending to exclude the possibility that the sunroofs

15 exploded due to debris are voluminous.  For instance, plaintiffs cite a purported NHTSA

16 complaint where part of the Roof exploded while the Class Vehicle was parked in a driveway,

17 and the glass around the explosion hole was "bowed outward as if something was shot through

18 from the inside of the vehicle," not from the outside.  (Doc. No. 11 at 5.)  That same NHTSA

19 complaint notes that there were no "trees or other possible falling hazards" near the driveway and

20 that nothing was found in or around the car to suggest an outside projectile had impacted the

21 vehicle.  (*Id.*)  Pictures included in the FAC of plaintiff Gamez's initial vehicle similarly appear

22 to show the glass around the hole in the Roof being pushed outward, not inward.  (*Id.* at ¶¶ 32,

23 69.)  Other purported NHTSA complaints quoted in plaintiffs' FAC also describe glass being

24 pushed outward.  (*See, e.g.*, *id.* at 45.)  Another NHTSA complaint quoted in the FAC describes

25 the vehicle's Roof exploding despite being generally "kept under a carport" with nothing above

26 the vehicle at the time the Roof exploded.  (*Id.* at 44.)  Yet another NHTSA complaint included in

27 plaintiffs' FAC states that dashcam footage shows the Roof spontaneously exploding while

28 "nothing abnormal" happens.  (*Id.* at 44–45.)  Moreover, the FAC contains allegations regarding

1  report after report of vehicle owners stating that they did not see or hear any projectile strike the

2  Class Vehicle before the Roof exploded.  (*See, e.g.*, *id.* at 43–48.)

3      Accordingly, defendants' motion to dismiss plaintiffs' FAC on the grounds that

4  plaintiffs' allegations fail to exclude an alternative explanation will be denied.  *See Ford v.*

5  *Hyundai Motor Am.*, No. 20-cv-00890-FLA-ADS, 2021 WL 7448507, at *11–12 (C.D. Cal.

6  Oct. 5, 2021) (rejecting the defendants' argument that the plaintiffs' allegations of spontaneous

7  cracks in their windshields failed to exclude the possibility that the windshields cracked after

8  being "hit by small pebbles or nuts").[3]

9      2.   Warranty Claims (Claims 1, 5, 6, and 7)

10      Plaintiffs assert claims for breach of express warranty arising under Song-Beverly,

11  California Commercial Code § 2313, and the MMWA.  "The Song-Beverly Act is a remedial

12  statute designed to protect consumers who have purchased products covered by an express

13  warranty. . . .  A buyer of consumer goods who is damaged by the manufacturer's failure to

14  comply with the act may bring an action to recover damages and other legal and equitable relief

15  . . . ."  *Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 144 Cal. App. 4th 785, 799 (2006).

16  California Commercial Code § 2313 describes the circumstances under which express warranties

17  by sellers arise.  Cal. Com. Code § 2313.  Lastly, the MMWA "borrows state law causes of

18  action" such as express and implied warranty claims.  *Clemens v. DaimlerChrysler Corp.*, 534

19  F.3d 1017, 1022 n.3 (9th Cir. 2008).  "Therefore, the federal claims hinge on the state law

20  warranty claims."  *Id.*

21      Plaintiffs also assert claims for breach of the implied warranty of merchantability arising

22  under Song-Beverly and the MMWA.  Song-Beverly creates such an implied warranty in most

23  commercial transactions.  *See* Cal. Civ. Code § 1792.

24  /////

---

25  [3]  Defendants also briefly argue in the pending motion to dismiss that plaintiffs' allegations are

26  contradictory because plaintiffs allege to have heard nothing strike their Class Vehicles while also
    alleging that the exploding Roofs sounded like gunfire.  (Doc. No. 13 at 17.)  Defendants'

27  argument in this regard is unavailing.  It is plausible that plaintiffs know what a rock striking the
    Roof would sound like and that plaintiffs did not hear any such sound before or during the

28  explosion of the Roofs.

1    In their pending motion, defendants argue that plaintiffs' express warranty claims must be

2    dismissed because plaintiffs have alleged at most a design defect not covered by the Limited

3    Warranty.  (Doc. No. 13 at 18–20.)  Defendants further argue that plaintiffs' implied warranty

4    claims must be dismissed, as plaintiffs have failed to allege that their Class Vehicles were unfit

5    for their ordinary purpose.  (Doc. No. 13 at 21.)  The court will address these arguments below.

6                          a.    *Breach of Express Warranty Claims*

7    In moving to dismiss the FAC, defendants argue that the Limited Warranty does not cover

8    design defects and that plaintiffs allege only a design defect.[4]  (Doc. No. 13 at 18–20.)  In their

9    opposition, plaintiffs contend that, even if the Limited Warranty does not cover design defects,

10   dismissal is only appropriate when the plaintiff's claims are "based solely on alleged design

11   defects."  (Doc. No. 17 at 12) (quoting *In re Toyota Motor Corp.*, No. 10-ml-02151-JVS-FMO,

12   2012 WL 12929769, at *26 (C.D. Cal. May 4, 2012)).  Further, plaintiffs argue that the

13   allegations in their FAC support a manufacturing defect claim.  (Doc. No. 17 at 12–13.)

14   The court does not agree with defendants that plaintiffs' claims are based solely on an

15   alleged design defect.  Contrary to defendants' argument (Doc. No. 13 at 19–20), although

16   plaintiffs allege the presence of the Defect in all Class Vehicles, that "does not necessarily mean

17   that the defect must be in the design."  *Falk v. Nissan N. Am., Inc.*, No. 17-cv-04871-HSG, 2018

18   WL 2234303, at *2 (N.D. Cal. May 16, 2018); *see also Mandani v. Volkswagen Grp. of Am., Inc.*,

19   No. 17-cv-07287-HSG, 2019 WL 652867, at *4 (N.D. Cal. Feb. 15, 2019) (declining to dismiss

20   the plaintiffs' breach of express warranty claim pursuant to Rule 12(b)(6), stating, "[a]t this stage,

21   the Court cannot say that Plaintiffs' allegations are limited to design defects.  The first amended

22   complaint identifies a number of purported symptoms which could plausibly be attributable to

23   material or workmanship defects"); *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1177

24   (N.D. Cal. 2017) (finding that the plaintiffs had sufficiently alleged a manufacturing defect in

25   exploding sunroofs even though the plaintiffs' "allegations do suggest that the defect is present in

26

27   [4]  In addition, defendants argue that plaintiffs fail to allege an express warranty claim based upon
     defendants' Monroney stickers and sales materials.  (Doc. No. 13 at 20.)  In their opposition to
     the pending motion, plaintiffs clarify that they are not pursuing breach of express warranty claims
28   "based on Toyota's Monroney stickers or its sales materials."  (Doc. No. 17 at 7 & n.1.)

1   all relevant models"); *Cabebe v. Nissan of N. Am., Inc.*, No. 18-cv-00144-WHO, 2018 WL

2   5617732, at *11 (N.D. Cal. Oct. 26, 2018) (finding that the plaintiffs had sufficiently alleged a

3   manufacturing defect even though the "plaintiffs' allegations suggest that the defect occurs

4   widely across all relevant models").

5         Specifically, in their FAC, plaintiffs allege that the Roofs explode "due to either deficient

6   materials used to make the panoramic roof itself, and/or deficient manufacturing processes."

7   (Doc. No. 11 at ¶ 5.)  As noted, plaintiffs also suggest that the Roofs may be compromised during

8   the process of fusing the ceramic enamels onto the tempered glass.  (*Id.* at ¶ 67.)  The court finds

9   that these allegations are sufficient to state a claim for a manufacturing defect.  *See Johnson*, 272

10  F. Supp. 3d at 1178 (finding that the plaintiffs had sufficiently alleged a manufacturing defect

11  because they had "plausibly alleged that these vehicles differ from the product the manufacturer

12  intended to sell; [defendants] could not have intended for the panoramic sunroofs to explode"); *id.*

13  ("Discovery may show that this defect is one in design, and [defendants are] welcome to revisit

14  the issue later in the proceedings.  For now, plaintiffs' allegations are sufficient to establish their

15  right to discovery to investigate the potential causes."); *Enea*, 2019 WL 402315, at *3 ("The

16  spontaneous shattering of the MBUSA sunroofs alleged by Plaintiff may be attributable to

17  material or workmanship defects.").

18        In addition, defendants argue that plaintiffs have failed to allege any express warranty

19  offered by defendant TMNA.  (Doc. No. 13 at 20–21.)  In their opposition to the pending motion,

20  plaintiffs withdraw their breach of express warranty claims brought against defendant TMNA, but

21  not those brought against defendant TMS.  (Doc. No. 17 at 7 & n.1.)

22        Because of plaintiff's withdrawal, defendants' motion to dismiss plaintiffs' express

23  warranty claims (claims 1, 6, and 7) brought against defendant TMNA will be granted.  However,

24  defendants' motion to dismiss plaintiffs' express warranty claims will otherwise be denied for the

25  reasons explained above.

26  /////

27  /////

28  /////

1     b.  *Breach of Implied Warranty Claims*

2    Defendants argue that plaintiffs' implied warranty claims should be dismissed because

3 plaintiffs have failed to sufficiently allege that the Class Vehicles were unmerchantable.  (Doc.

4 No. 13 at 21.)

5    Under California law, "every sale of consumer goods . . . shall be accompanied by the

6 manufacturer's and the retail seller's implied warranty that the goods are merchantable."  Cal.

7 Civ. Code § 1792.  To maintain a claim for breach of the implied warranty of merchantability, a

8 plaintiff must plausibly allege that "the alleged defect rendered the car unfit for its ordinary

9 purpose of safe transportation."  *Zuehlsdorf v. FCA US LLC*, No. 22-55270, 2023 WL 385175, at

10 *2 (9th Cir. 2023); *see also Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234,

11 1248 (2018) (holding that "allegations showing an alleged defect that created a substantial safety

12 hazard would sufficiently allege" that the vehicle was unmerchantable); *Isip v. Mercedes-Benz*

13 *USA, LLC*, 155 Cal. App. 4th 19, 23 (2007) (upholding jury instructions stating that "[f]itness for

14 the ordinary purpose of a vehicle means that the vehicle should be in safe condition and

15 substantially free of defects").  "[A] defect need not render a vehicle inoperable to give rise to a

16 claim for breach of implied warranty."  *Troup v. Toyota Motor Corp.*, 545 Fed. App'x. 668, 669

17 (9th Cir. 2013) (citing *Isip*, 155 Cal. App. 4th at 23).

18    Defendants argue in their pending motion that plaintiffs' allegations are similar to those

19 the district courts considered in *Sweeny I*, 2023 WL 2628697, at *12–13, and *Sanchez v. Kia*

20 *Motors Am., Inc.*, No. 20-cv-01604-JLS-KES, 2021 WL 4816834, at *12 (C.D. Cal. Aug. 9,

21 2021) ("*Sanchez I*"), where the courts dismissed the plaintiffs' implied warranty claims because

22 they had not alleged that their vehicles were not merchantable.  (Doc. No. 13 at 22.)  In *Sweeny I*,

23 the district court held that the plaintiffs' allegations that windshields spontaneously shattered or

24 cracked were insufficient to plead that the Class Vehicles were unmerchantable at the time of sale

25 because most of the plaintiffs did not allege "that the cracks in their windshields impaired their

26 ability to drive."  2023 WL 2628697, at *12.  However, as to the lone plaintiff in that case who

27 did allege that the "defect negatively impacted her ability to safely drive her vehicle because the

28 crack was directly in the driver's line of sight and thus distracted [that plaintiff] from her view of

the road," the court found that her allegations were sufficient to state a claim that her vehicle was not merchantable. *Id.* In *Sanchez I*, the district court held that similar allegations to those in *Sweeny I* were insufficient because "none of the Plaintiffs allege[d] that the crack [in the windshield] appeared while they were driving," "that the crack was large enough to impede their view had they been driving when it appeared," or that "that the crack was so severe as to create a risk that the windshield would shatter and harm passengers." 2021 WL 4816834, at *12.

Here, the court finds that plaintiffs have provided critical allegations in their FAC that the district courts found absent in *Sweeny I* or *Sanchez I*. *See Sweeny I*, 2023 WL 2628697, at *12–13; *Sanchez I*, 2021 WL 4816834, at *12. Notably, here, plaintiffs allege many instances of drivers complaining that the exploding Roofs impaired their ability to drive their vehicles and nearly caused several car accidents. For instance, plaintiffs quote purported NHTSA complaints stating that the exploding Roofs were "very shocking and distracting," caused the driver to "swerve[] into the opposite lane due to the sound," and sounded "like a gunshot." (Doc. No. 11 at 44, 46; *see also id.* at 47 (quoting a NHTSA complaint stating that "there was a LOUD explosion in my car that scared the hell out of my friend and I, almost causing me to get into an accident")).) Plaintiffs also allege several instances of broken glass falling onto occupants of the vehicle after the Roofs exploded. (*See, e.g.*, *id.* at 42–44.) These allegations are more similar to those made by the lone plaintiff in *Sweeny I* and that the district court found stated a claim for breach of implied warranty. *See Sweeny I*, 2023 WL 2628697, at *12.

Plaintiffs' allegations here are also similar to those in *Sanchez v. Kia Motors Am., Inc.*, No. 20-cv-01604-JLS-KES, 2022 WL 19692253 (C.D. Cal. July 21, 2022) ("*Sanchez II*"). After the plaintiffs' breach of implied warranty claims were dismissed with leave to amend in *Sanchez I*, the plaintiffs filed an amended complaint. *Sanchez II*, 2022 WL 19692253, at *1. The district court then found that the plaintiffs had sufficiently alleged in their amended complaint that the windshield defect rendered the vehicles "unsuitably dangerous for driving" because the plaintiffs "provided several examples of cracks caused by the windshield defect" and "provided allegations as to how the cracked windshields impacted their driving." *Id.* at *3.

/////

13

1    In their pending motion to dismiss, defendants further argue that plaintiffs "cannot claim

2  that the alleged defect makes their vehicles unmerchantable and, at the same time, concede that

3  they have continued using the vehicles for their ordinary purpose of transportation."  (Doc.

4  No. 13 at 22.)  As a logical matter, this is incorrect, as defendants misstate the law:  The ordinary

5  purpose of a car is not merely transportation, but "safe transportation."  *Zuehlsdorf*, 2023 WL

6  385175, at *2.

7    Moreover, the decisions defendants cite in support of their argument that plaintiff's Class

8  Vehicles are not unmerchantable are all inapposite, unpersuasive, or both.  Defendants cite

9  *McGee v. Mercedes-Benz USA, LLC*, 612 F. Supp. 3d 1051 (S.D. Cal. 2020) and *Tae Hee Lee v.*

10  *Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962 (C.D. Cal. 2014), two decisions that are

11  clearly inapposite because, while the plaintiffs in those cases did continue to drive their cars, they

12  never experienced any problems with the cars to begin with.  *See McGee*, 612 F. Supp. 3d at

13  1061; *Lee*, 992 F. Supp. 2d at 973.

14    Also inapposite is *Elfaridi v. Mercedes-Benz USA, LLC*, No. 16-cv-01896-CDP, 2018 WL

15  4071155 (E.D. Mo. Aug. 27, 2018), a decision defendants cite from the Eastern District of

16  Missouri applying what appears to be a different legal standard and finding no breach of implied

17  warranty because the vehicle "successfully functioned for several years before the sunroof

18  shattered."  *Elfaridi*, 2018 WL 4071155, at *10.  Here, plaintiffs allege in their FAC that the

19  Roofs exploded "almost immediately—often within weeks" of the vehicles first being driven.

20  (Doc. No. 11 at ¶ 91.)

21    Lastly, defendants cite *Loo v. Toyota Motor Sales, USA, Inc.*, No. 19-cv-00750-VAP-

22  ADS, 2019 WL 7753448 (C.D. Cal. 2019), wherein the district court held that the vehicles were fit

23  for driving as intended because the plaintiffs continued to drive the vehicles despite delays in

24  shifting and acceleration.  *Loo*, 2019 WL 7753448 at *7.  *Loo* is not binding, and it is inapposite.

25  The vehicles in *Loo* exhibited continual minor problems, not one-time, shocking explosions of

26  glass potentially prompting drivers to veer into oncoming traffic.  *Id.*

27    Here, plaintiffs "allege[] a defect that renders the [Toyota] vehicles unfit for driving."

28  *Enea*, 2019 WL 402315, at *5.  Plaintiffs allege "that the sunroofs in the [Toyota] vehicles are

prone to explode while the cars are in motion, causing shards of glass to fall on drivers while operating the vehicle.  The alleged defect poses a risk for any driver on the road, and is more than sufficient to survive at the pleading stage."  *Id.*; *see also Tappana v. Am. Honda Motor Co.*, 609 F. Supp. 3d 1078, 1086 (C.D. Cal. 2022) (holding that the plaintiffs' allegations "that when their sunroofs shattered while they were driving, they were distracted and put themselves and others at risk of collision," made it "plausible that the spontaneous shattering of the sunroofs in Plaintiffs' vehicles caused a safety hazard that made their vehicles unsafe to drive—and therefore unfit for their ordinary purpose").  Here, plaintiffs have sufficiently alleged that their Class Vehicles are unfit for their ordinary purpose of safe transportation.

Accordingly, defendants' motion to dismiss plaintiffs' claims for breach of the implied warranty of merchantability in violation of the MMWA (claim 1) and Song-Berkeley (claim 5) will be denied.

### 3.   Unjust Enrichment, CLRA, UCL (Fraudulent & Unfair Prongs) (Claims 2, 3, and 4)

Defendants argue that some of plaintiffs' claims sounding in fraud[5] fail to satisfy Rule 9(b)'s heightened pleading standard.  (Doc. No. 13 at 22.)  Plaintiffs do not dispute that Rule 9(b) applies but contend that their allegations of fraud are adequate.  (Doc. No. 17 at 17); *see also Kearns*, 567 F.3d at 1125 ("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL.").

California's UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  The three aforementioned "prongs" each maintain a distinct theory of liability and basis for relief.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).  Plaintiffs allege that defendants' actions violated all three prongs of the UCL.

---

[5]  Those sounding in fraud are plaintiffs' CLRA claim, UCL claims for fraudulent and unfair practices, and unjust enrichment claim seeking disgorgement of profits and injunctive relief enjoining defendants' alleged misleading business practices.  Plaintiffs' unjust enrichment claim seeking injunctive relief compelling defendants to provide safety repairs to the Class Vehicles does not sound in fraud and will therefore be considered separately.

(Doc. No. 11 at ¶ 195; *see also id.* at ¶¶ 178–200.)  At the December 5, 2023 hearing, plaintiffs' counsel clarified that plaintiffs' UCL unfair conduct claim stems from the same alleged conduct as does plaintiffs' UCL fraudulent conduct claim, namely defendants' alleged omissions or concealment of the Defect.  The court will therefore analyze plaintiffs' unfair conduct and fraudulent conduct claims together.  *See In re Intel Corp. CPU Mktg., Sales Prac. and Prod. Liab. Litig.*, 2023 WL 7211394, at *2 (9th Cir. Nov. 2, 2023) (affirming a district court's dismissal of the plaintiffs' UCL unfair conduct claim because the plaintiffs' allegations "were coextensive with those of the previously dismissed omission-based claims").  Because plaintiffs' UCL unlawful conduct claim is not predicated on defendants' alleged omissions or concealment and is therefore not subject to Rule 9(b), the court will consider that claim separately.  *See In re Natera Prenatal Testing Litig.*, __ F. Supp. 3d __, No. 22-cv-00985-JST, 2023 WL 3370737, at *4 (N.D. Cal. Mar. 28, 2023) (holding that Rule 9(b) does not apply to UCL unlawful conduct claims predicated on warranty claims).

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer . . . ."  Cal. Civ. Code § 1770(a).  "[T]he standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA, and courts often analyze the two statutes together."  *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1097 (N.D. Cal. 2014).

In addition, to state a cognizable standalone cause of action for unjust enrichment, a plaintiff must plead that the defendant "has been unjustly conferred a benefit through mistake, fraud, coercion, or request."  *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal quotations and citation omitted).  To the extent that plaintiffs seek disgorgement of profits and injunctive relief enjoining defendants' alleged misleading business practices, plaintiffs' unjust enrichment claim will be analyzed alongside plaintiffs' CLRA and UCL fraudulent and unfair conduct claims.  *See In re Intel Corp.*, 2023 WL 7211394, at *1 n.3 (noting that the plaintiffs' unjust enrichment claim "is predicated on the same conduct as plaintiffs' UCL

/////

claim, and the two claims therefore rise or fall together").  In sum, the court will analyze all of plaintiffs' claims sounding in fraud together.

To survive defendants' motion to dismiss their claims sounding in fraud, plaintiffs must allege that defendants made some actionable misrepresentation.  *See, e.g.*, *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 933 (N.D. Cal. 2012) (dismissing the plaintiffs' unjust enrichment claim because the plaintiff "failed to sufficiently plead an actionable misrepresentation or omission").  Plaintiff's claims sounding in fraud are based on an active concealment theory, specifically that defendants concealed the Defect from consumers.  (*See* Doc. No. 11 at ¶¶ 151, 166, 172, 180.)

In their pending motion to dismiss, defendants raise four arguments as to why plaintiffs' claims sounding in fraud fail:  (1) plaintiffs fail to sufficiently allege defendants' pre-sale knowledge of the Defect; (2) plaintiffs fail to allege the "who, what, when, where, and how" of the misleading statements or omissions; (3) plaintiffs fail to sufficiently allege the active concealment upon which the claims sounding in fraud are predicated; and (4) plaintiffs lump the defendants together.  (Doc. No. 13 at 22–29.)  As explained below, the court finds that plaintiffs have sufficiently alleged pre-sale knowledge with respect to plaintiff Takili but not with respect to plaintiff Gamez; plaintiffs have alleged the who, what, when, where, and how of defendants' omissions; and plaintiffs have sufficiently alleged active concealment.  However, as plaintiffs' counsel acknowledged at the December 5, 2023 hearing, plaintiffs impermissibly lump defendants together.  Consequently, plaintiffs' claims sounding in fraud will be dismissed.

> a.  *Whether Plaintiffs Sufficiently Allege Defendants' Pre-sale Knowledge of the Defect*

To state a UCL, CLRA, or unjust enrichment claim predicated on an omission theory, a plaintiff must sufficiently allege that the manufacturer knew of the defect at the time of sale to the plaintiff.  *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (holding that a UCL or CLRA claim for failing to disclose a defect requires the plaintiff to plead pre-sale knowledge); *In re Samsung Galaxy Smartphone Mktg. and Sales Pracs. Litig.*, 2020 WL 764461, at *12 (N.D. Cal. Dec. 24, 2020) (dismissing "plaintiffs' unjust enrichment claim because plaintiffs have failed to establish that defendants had any knowledge of any defect").

1    In their motion to dismiss, defendants argue that plaintiffs have failed to sufficiently

2    allege defendants' knowledge of the Defect at the time of sale of the Class Vehicle to plaintiff

3    Gamez and plaintiff Takili.  (Doc. No. 13 at 24.)  Plaintiffs argue in their opposition that

4    defendants had exclusive and superior knowledge of the Defect arising from five categories of

5    information:  (1) NHTSA and online complaints; (2) customer complaints to defendants and their

6    dealerships; (3) early reports of the Defect directly from dealerships; (4) replacement part sales

7    data; and (5) internal testing of the Class Vehicles.  (Doc. No. 17 at 18.)

8    As explained below, when viewing the FAC in a light most favorable to plaintiffs, the

9    court finds that there are sufficient allegations to show, if proven, that defendants knew of the

10   alleged Defect by the time plaintiff Takili purchased his Class Vehicle, but not before plaintiff

11   Gamez purchased hers.

12                          i.      NHTSA and Online Complaints

13   The parties appear to agree that defendants may have had timely knowledge of the alleged

14   defect if an unusual number of NHTSA and online complaints were posted before plaintiffs

15   purchased their Class Vehicles.  (Doc. Nos. 13 at 28; 17 at 18); *see also Williams*, 851 F.3d at

16   1026 (holding that an "unusually high" number of consumer complaints may be sufficient to

17   establish a manufacturer's knowledge).  However, defendants argue that the timing of the

18   NHTSA complaints undermines plaintiffs' allegations that defendants had pre-sale knowledge of

19   the Defect.  (Doc. No. 13 at 28.)

20   In their FAC, plaintiffs allege that an unusually high number of complaints were made

21   prior to plaintiff Takili's purchase of the Class Vehicle, but not prior to plaintiff Gamez's.

22   Plaintiffs allege in their FAC an unusually high number of NHTSA complaints regarding the

23   Roofs in the Class Vehicles.  Plaintiffs also allege data comparing the Class Vehicles to other

24   2021 Toyota Crossovers and SUVs.  (Doc. No. 11 at ¶¶ 121–25.)  The alleged data shows 24

25   NHTSA complaints filed from October 15, 2020 to April 11, 2023 about the Roofs in the Class

26   Vehicles arising from approximately 400,000 vehicles, compared to only four NHTSA

27   complaints about glass roofs arising from the approximately 500,000 other vehicles.  (Doc.

28   No. 11 at 41–48; *see also* Doc. No. 17 at 19.)  This data suggests that the Roofs in the Class

18

1    Vehicles are over seven times more likely to be defective than glass roofs in other 2021 Toyota

2    Crossovers and SUVs.  This qualifies as "an unusually high number of complaints" regarding the

3    Roofs.  *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1027 (9th Cir. 2017); *see also Sweeny II*,

4    2023 WL 4681567, at *4 ("Plaintiffs have further supported their allegations by providing a

5    baseline to demonstrate that 27 complaints represent more than six times the total number of

6    windshield-related NHTSA complaints collectively submitted by the approximately 860,000

7    owners of five other popular Toyota vehicles.  Thus, unlike before, the Court now has a baseline

8    upon which to conclude that Plaintiffs have plausibly pled an unusual number of complaints.")

9    (internal citations and quotation marks omitted).

10        Because the alleged NHTSA complaints all post-date plaintiff Gamez's purchase, the

11   complaints provide no support for defendants' pre-sale knowledge with respect to plaintiff

12   Gamez.  As defendants point out, plaintiffs have cited no NHTSA complaints that pre-date

13   plaintiff Gamez's purchase of her Class Vehicle in September 2020.  (Doc. No. 13 at 28.)

14   Plaintiffs appear to concede in their opposition to the pending motion that they offer no

15   allegations in their FAC of NHTSA or online complaints posted before plaintiff Gamez purchased

16   her Class Vehicle.  (Doc. No. 17 at 20.)  Nor can the court discern any such allegations from the

17   FAC.  Consequently, the NHTSA and online complaints do not provide any support for a

18   reasonable inference that defendants had knowledge of the Defect before plaintiff Gamez

19   purchased her Class Vehicle.

20        However, plaintiffs allege that seven NHTSA complaints were submitted before plaintiff

21   Takili purchased his Class Vehicle on December 31, 2021.  (Doc. No. 11 at 42–44.)  Defendants

22   provide the court with no reason to believe that these complaints were not filed at a similarly high

23   rate as the complaints in the total dataset (i.e., roughly seven times more often than complaints

24   about non-panoramic sunroofs in similar vehicles).  Indeed, those seven complaints were filed in

25   the roughly 18 months beginning when the Class Vehicle entered the market (the summer of

26   2020) and ending when plaintiff Takili purchased his Class Vehicle on December 31, 2021.  By

27   contrast, as noted above, the comparison vehicles generated roughly half as many complaints in

28   /////

1  twice as many months.  At minimum, the seven NHTSA complaints are probative of defendants'

2  pre-sale knowledge with respect to plaintiff Takili.

3  　　　Furthermore, as plaintiffs point out in their opposition, they also have alleged that

4  defendants received other online complaints through social media, such as Reddit and Facebook.

5  (Doc. No. 17 at 22) (citing Doc. No. 11 at ¶¶ 99–104).  Defendants argue that these allegations

6  are not a sufficient basis upon which to assert that defendants were aware of complaints on such

7  third-party websites. (Doc. No. 13 at 29.)  However, plaintiffs specifically allege that defendants'

8  Chief Information Officer and websites stated that defendants monitor and collect data from

9  social media, including Facebook.  (Doc. Nos. 11 at ¶¶ 98–104; 17 at 22.)  In addition, plaintiffs

10  allege several complaints posted before December 2021 on Reddit, the Toyota enthusiast website

11  ToyotaNation.com, and various Toyota-related Facebook groups.  (Doc. No. 11 at ¶¶ 107–109,

12  111.)  Plaintiffs further allege that defendants themselves have stated that they use the data

13  collected from social media for quality control purposes.  (Doc. Nos. 11 at ¶ 104; 17 at 22.)

14  　　　The court finds that plaintiffs' allegations regarding third-party website complaints are

15  moderately probative of defendants' pre-sale knowledge of the Defect with respect to plaintiff

16  Takili.  *See Sweeny II*, 2023 WL 4681567, at *5 (finding "certain of the third-party website

17  complaints to be at least moderately probative of Toyota's pre-sale knowledge of the Windshield

18  Defect" where the plaintiffs "bolstered their allegations by pointing to Toyota's own disclosures

19  that Toyota not only monitors the third-party websites, such as Facebook, but it also collects

20  information posted by customers and uses the information it collects . . . for Quality control

21  purposes").

22  　　　In sum, the alleged NHTSA and online complaints are probative of defendants' pre-sale

23  knowledge with respect to plaintiff Takili, but not with respect to plaintiff Gamez.

24  　　　　　　　ii.　　　Customer Complaints to Defendants and Their Dealerships

25  　　　Plaintiffs maintain that the FAC sufficiently alleged that defendants obtained pre-sale

26  knowledge about the alleged Defect through an unusual number of customer complaints to

27  defendants.  (Doc. Nos. 17 at 23.)  However, defendants argue in their motion to dismiss that

28  plaintiffs do not identify "a single consumer complaint made to a Toyota dealer, let alone a 'large

number' of such complaints or when they were made." (Doc. No. 13 at 27.)  Plaintiffs refute this argument, pointing out that in their FAC, they cite to complaints made to dealers from June, July, and August of 2021, (Doc. Nos. 11 at ¶¶ 107, 126, 111; 17 at 23), predating plaintiff Takili's purchase of the Class Vehicle, but not plaintiff Gamez's.

Consequently, with respect to plaintiff Takili, the court finds some of the alleged complaints to the dealers probative of defendants' pre-sale knowledge of the Defect.  However, because all of the cited complaints to the dealers post-date September 18, 2020, the court does not find them to be probative of defendants' pre-sale knowledge with respect to plaintiff Gamez.

iii.    Early Reports from Dealers

In their FAC, plaintiffs allege that defendants gained pre-sale knowledge of the Defect via reports from dealerships.  Plaintiffs allege that defendants' "Logistics Services Transportation Claims Policies & Procedures Manual" requires their dealers to report when glass in a vehicle breaks prior to or upon delivery to the dealership, and that the Roofs explode within days or weeks of use.  (Doc. No. 11 at ¶ 82.)  Plaintiffs argue that these allegations imply that some Roofs must have exploded while the Class Vehicles were in transit, and that dealers must have then reported the broken glass caused by the Defect immediately after receiving the Class Vehicles.  (*Id.* at ¶¶ 80–83.)

Defendants argue that plaintiffs allege no such instances of early reports from dealers and that plaintiffs' allegations are entirely speculative and implausible.  (Doc. No. 13 at 27.)  At the hearing, plaintiffs could not explain why shipping the Class Vehicles would trigger the Defect, which plaintiffs allege is caused by the stress of driving the Class Vehicles.  Plaintiffs' counsel declined to argue that dealers discovered the Defect by driving the Class Vehicles themselves.

The alleged requirement that dealers report broken glass upon receipt of the Class Vehicles, without more, is not probative of defendants' pre-sale knowledge.  Consequently, the court concludes that alleged early reports from dealers are not probative of defendants' pre-sale knowledge with respect to either plaintiff.

/////

/////

iv.     Replacement Part Sales Data

Plaintiffs allege that defendants gained pre-sale knowledge of the Defect via the unusually high number of replacement Roof orders that defendants received from Toyota dealerships and third parties.  (Doc. No. 11 at ¶¶ 84–89.)  Defendants argue that plaintiffs' allegations regarding replacement part sales data are speculative and unsupported.  (Doc. No. 13 at 27.)  Defendants contend that plaintiffs fail to allege the existence of any data showing the replacement of Roofs at high rates, what the replacement rates were, which dealerships or repair facilities were requesting the replacements, with which other Toyota vehicles plaintiffs are comparing the Class Vehicles, or when the replacement rate was elevated.  (*Id.*)  However, defendants cite no authority suggesting plaintiffs must allege any of this information.

Plaintiffs correctly note in their opposition to the pending motion that they have alleged that:  (1) complaints about defective Roofs are filed at unusually high rates compared to glass roofs in similar Toyota vehicles; (2) defendants maintain replacement part sales data which includes the number of Roofs sold; and (3) Toyota service centers and third-party installers order the Roofs directly from defendants.  (Doc. Nos. 17 at 25; 11 at ¶¶ 84–87, 91.)  For instance, plaintiffs allege that plaintiff Gamez twice used a third-party installer to replace her Roof and that the installer ordered the Roof from defendants both times.  (Doc. No. 11 at ¶¶ 37, 40.)  While plaintiffs do not have access to defendants' internal part sales records, plaintiffs persuasively argue in their opposition that these allegations imply that those records must show that the Roofs are defective at unusually high rates.  (Doc. No. 17 at 25.)

Consequently, the court concludes that the replacement part sales data is probative of defendants' pre-sale knowledge with respect to plaintiff Takili.  However, because plaintiffs do not allege complaints made prior to September 18, 2020, nor any manifestations of the Defect necessitating replacements at all before that date, the replacement part sales data is not probative of defendants' pre-sale knowledge with respect to plaintiff Gamez.

v.     Internal Durability Testing

Plaintiffs allege that defendants gained knowledge of the Defect via durability and quality assurance testing conducted prior to the Class Vehicles' release.  Defendants argue that plaintiffs'

1  allegations regarding pre-sale testing of the Class Vehicles "do 'not suggest how any tests or

2  information could have alerted [defendants] to the defect,' rendering their allegations

3  'speculative.'"  (Doc. No. 13 at 26) (quoting *Wilson*, 668 F.3d at 1147).  Neither, defendants

4  argue, do plaintiffs identify what kind of testing defendants conducted on the Roofs.  (*Id.*)

5       Plaintiffs respond that the allegations in their FAC are sufficiently detailed on this point.

6  (Doc. No. 17 at 26.)  For instance, plaintiffs allege in their FAC the general time that testing

7  occurred ("between 2019 and early 2020"), the location (the "Arizona Proving Ground, a 12,000

8  acre facility with 60-lane miles of paved and dirt tracks"), and an additional quality assurance

9  system employed by defendants (the "Toyota Production System").  (Doc. No. 11 at ¶¶ 75–77.)

10  Plaintiffs further allege that the Defect can manifest "almost immediately" after commencing

11  driving.  (Doc. No. 11 at ¶ 91.)  It is true that plaintiffs do not spell out exactly how the pre-sale

12  testing (i.e., driving the Class Vehicles on the tracks) could have alerted defendants to the Defect

13  (i.e., the Roof explodes when the Class Vehicle is driven), but the court finds that plaintiffs'

14  allegations certainly suggest this easily inferred information.

15       Consequently, the court finds plaintiffs' allegations of defendants' pre-sale testing to be at

16  least minimally probative of defendants' pre-sale knowledge of the Defect with respect to both

17  plaintiffs Takili and Gamez.  *See Tappana*, 609 F. Supp. 3d at 1088 (holding that the defendant

18  had pre-sale knowledge of a defect in part because the defendant "conducts presale durability

19  testing metrics and quality assurance activities"); *cf. Zuehlsdorf*, 2019 WL 2098352, at *8

20  ("Defendant asks the Court to adopt an impossible pleading standard that would require plaintiffs

21  to simultaneously plead that a defendant had *exclusive* knowledge of a defect, while also citing,

22  prior to discovery, 'actual testing records or data' demonstrating existence of the defect.").

23          vi.    Whether Plaintiffs Sufficiently Allege Defendants' Pre-sale

24               Knowledge with Respect to Each Plaintiff

25       The court will consider whether plaintiffs' allegations, taken together, are sufficient to

26  permit the reasonable inference that defendants knew of the Defect before plaintiffs purchased

27  their Class Vehicles.

28  /////

1    Plaintiffs and defendants each cite to a raft of decisions by district courts in the Ninth

2    Circuit considering whether allegations similar to those advanced by plaintiffs here were

3    sufficient to assert a defendant's pre-sale knowledge of a defect in a vehicle.  (*See, e.g.*, Doc.

4    Nos. 13 at 24–29; 17 at 9 & n.9.)  In those cases, the courts generally found the plaintiffs'

5    allegations sufficient to plead defendants' pre-sale knowledge when the plaintiffs' allegations

6    included multiple sources of information.

7    Here, the court finds that plaintiffs' allegations are more than sufficient to allege pre-sale

8    knowledge of the Defect by defendants with respect to plaintiff Takili.  Defendants cite several

9    district court cases for the proposition that a not-unusual number of consumer complaints, absent

10   any additional basis for a defendant's knowledge, is generally insufficient to plead pre-sale

11   knowledge of a defect.  (Doc. No. 13 at 28) (citing, *e.g., Punian v. Gillette Co.*, No. 14-cv-05028-

12   LHK, 2015 WL 4967535, at *10–11 (N.D. Cal. Aug. 20, 2015) (dismissing the plaintiff's

13   complaint because the "Plaintiff's sole allegation regarding Defendants' knowledge . . . is that

14   consumers filed 'numerous complaints' with Defendants")).  These cases are inapposite for two

15   reasons.  First, plaintiffs allege unusual rates of NHTSA complaints prior to plaintiff Takili's

16   purchase of the Class Vehicle.  Second, plaintiffs allege several additional bases for defendants'

17   knowledge:  online complaints in forums monitored by defendants; customer complaints made

18   directly to defendants and their dealerships; unusual rates of replacement Roof sales; and

19   durability testing of the Class Vehicles that would have quickly revealed that the Roofs explode

20   when driven.  Moreover, plaintiffs' allegations are not conclusory as to any of the four probative

21   categories of information.  Rather, plaintiffs allege additional details in support of each category.

22   To compare to two recent decisions by district courts involving exploding sunroofs,

23   plaintiffs' allegations in their FAC regarding plaintiff Takili are more similar to the allegations

24   found to be sufficient by the district court in *Tappana*, 609 F. Supp. 3d 1078, than to the

25   allegations found to be insufficient by the district court in *Enea*, 2019 WL 402315.  *See Tappana*,

26   609 F. Supp. 3d at 1088 (finding that the plaintiffs had alleged that the defendant "had notice of

27   the Defect at the time the Class Vehicles were sold to Plaintiffs" in part because the plaintiffs had

28   alleged that "consumers complained to Honda on third-party websites about its sunroofs; and

24

1    Honda conducts presale durability testing metrics and quality assurance activities"); *Enea*, 2019

2    WL 402315, at *5 (finding that "allegations of knowledge compris[ing]:  (1) allegations regarding

3    other car manufacturers . . . (2) allegations that Defendants 'have changed providers or vendors

4    for their sunroof glass because of the problems and defects'; and (3) generalized allegations that

5    MBUSA vehicle drivers have complained to Defendants about their sunroofs" were insufficient).

6    Unlike the plaintiffs' allegations in *Enea*, here, the plaintiffs' allegations all concern the Class

7    Vehicles, not other cars from other manufacturers, and the allegations regarding the NHTSA and

8    online complaints are far more detailed with respect to time and numerosity than mere

9    "generalized allegations" of owners complaining.  *Enea*, 2019 WL 402315, at *5.  The court

10   therefore finds that plaintiffs have sufficiently alleged defendants' pre-sale knowledge of the

11   Defect with respect to plaintiff Takili.

12        However, plaintiffs have failed to adequately allege pre-sale knowledge with respect to

13   plaintiff Gamez.  Plaintiffs allege NHTSA complaints, online complaints, and complaints to

14   dealers which all post-date plaintiff Gamez's purchase.  Because these alleged instances of Roofs

15   exploding all occurred after Gamez's purchase, the Roof replacement part sales data does not

16   suggest pre-sale knowledge either.  Plaintiffs' only remaining allegations in their FAC alleging

17   pre-sale knowledge with respect to plaintiff Gamez are the allegations of durability testing, which

18   alone are insufficient.  *See Browning v. Am. Honda Motor Co.*, No. 20-cv-05417-BLF, 2022 WL

19   5287775, at *3 (N.D. Cal. Oct. 6, 2022) (noting that "there appears to be a split at the district-

20   court level as to whether allegations of pre-sale testing like those here are sufficient to establish

21   knowledge" and that "dispositive in the case law split was whether the plaintiffs provided

22   additional information supporting their allegations" of durability testing) (internal citations and

23   quotation marks omitted).

24            b.      *Whether Plaintiffs Sufficiently Allege the Who, What, When, Where, and*

25                    *How of Defendants' Omissions*

26        Defendants argue that plaintiffs have failed to allege the "who, what, when, where, and

27   how" required by Rule 9(b) for their claims sounding in fraud.  (Doc. No. 13 at 23.)  In their

28   opposition, plaintiffs contend that certain kinds of claims sounding in fraud, including those

1    brought here, are subject to a more relaxed standard under Rule 9(b) than other fraud claims.

2    (Doc. No. 17 at 16.)

3            The court agrees with plaintiffs that application of the more relaxed pleading standard is

4    appropriate in this instance.  Defendants cite one decision in which the district court expressly

5    declined to "follow district court decisions adopting the position that a 'relaxed' pleading

6    standard applies to omission-based claims."  (Doc. No. 23 at 10) (quoting *Raynaldo v. Am. Honda*

7    *Motor Co., Inc.*, No. 21-cv-05808-HSG, 2022 WL 4358096, at *7 (N.D. Cal. 2022)).  The district

8    court in *Raynaldo* instead followed the district court's decision in *Marolda v. Symantec Corp.*,

9    672 F. Supp. 2d 992 (N.D. Cal. 2009) and applied the typical heightened Rule 9(b) standard.

10   However, "[v]irtually every court to consider *Marolda* where there are claims like the instant

11   case—alleged omission regarding a material defect in a vehicle—has rejected its applicability."

12   *Plotts v. Am. Honda Motor Co., Inc.*, No. 22-cv-04529-CJC-AS, 2023 WL 4843342, at *6 (C.D.

13   Cal. June 9, 2023) (collecting cases).  Here, the court agrees with the vast majority of district

14   courts that "Rule 9(b)'s 'who, what, when, where, and how' test" must be applied while "mindful

15   of the [] 'inherent limitations of an omission claim.'"  *In re Vizio, Inc., Consumer Priv. Litig.*, 238

16   F. Supp. 3d 1204, 1229 (C.D. Cal. 2017) (quoting *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d

17   1087, 1096 (N.D. Cal. 2014)); *cf. Moore*, 966 F.3d at 1020 ("Even in cases where fraud is

18   alleged, we relax pleading requirements where the relevant facts are known only to the

19   defendants.") (quoting *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995)).  Therefore, to

20   plead a claim for fraud by omission, a plaintiff "must both describe the content of the omission

21   and where the omitted information should or could have been revealed."  *Tappana*, 609 F. Supp.

22   3d at 1088 (internal citations omitted).

23           Plaintiffs easily clear this threshold.  As discussed above, plaintiffs have sufficiently

24   described the content of the omission, i.e., the Defect, in detail.  Moreover, in their FAC,

25   plaintiffs allege that they reviewed defendants' Monroney stickers, brochures, and websites

26   before purchasing the Class Vehicles.  (Doc. No. 11 at ¶¶ 27, 45.)  Plaintiffs allege further that

27   none of defendants' representations disclosed the potential for the Roof to explode, and that

28   plaintiffs would not have purchased the Class Vehicles had such disclosure been made.  (*Id.* at

¶¶ 31, 49.)  "In short, the 'who' is [defendants], the 'what' is [their] knowledge of a defect, the 'when' is prior to the sale of Class Vehicles, and the 'where' is the various channels of information through which [defendants] sold Class Vehicles."  *MacDonald*, 37 F. Supp. 3d at 1098; *see, e.g.*, *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 877 (N.D. Cal. 2018) (quoting *MacDonald* for the same); *Plotts*, 2023 WL 4843342, at *6 (same).

c.      *Whether Plaintiffs Sufficiently Allege Active Concealment*

Defendants next argue that plaintiffs "only generically allege that defendants failed to disclose the purported defect" and that mere nondisclosure cannot sustain a claim of active concealment.  (Doc. No. 13 at 29.)  Because they fail to plead the predicate active concealment, defendants argue, plaintiffs' claims sounding in fraud must be dismissed. *See, e.g.*, *Donohue*, 871 F. Supp. 2d at 933 (dismissing the plaintiffs' unjust enrichment claim because the plaintiff "failed to sufficiently plead an actionable misrepresentation or omission"); *Espineli v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:17-00698-KJM-CKD, 2019 WL 2249605, at *8 (E.D. Cal. May 24, 2019) (dismissing the plaintiffs' CLRA claim because the plaintiffs failed to "plead a duty to disclose due to active concealment").

However, "[c]ourts have found similar allegations of nondisclosure combined with affirmative denials of the defect and denials of free servicing or repairs of defective parts sufficient" to adequately plead active concealment.  *Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp. 3d 1149, 1166 (C.D. Cal. 2022).  Here, plaintiffs allege in their FAC that plaintiffs Gamez and Takili notified defendants and Toyota dealerships of the Defect and that defendants and the dealership refused to repair the Roofs of plaintiffs' vehicles.  (Doc. No. 11 at ¶¶ 41, 53–58.)  Plaintiffs further allege several NHTSA complaints in which defendants and Toyota dealerships similarly refused to repair the Roofs of numerous other customers "unless [the customer] can prove it was a defective glass/part" or because a "rock must have hit" the Roof.  (*Id.* at ¶ 93.)  These allegations are sufficient to plead active concealment of the Defect.  *See, e.g.*, *Cho*, 636 F. Supp. 3d at 1166 (finding that the plaintiffs had sufficiently alleged active concealment by alleging that "when the vehicles were presented to authorized dealerships with excessive oil consumption, Defendants advised customers that the excessive oil consumption is normal").

27

1              d.      *Whether Plaintiffs Lump Defendants Together*

2              "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but

3   requires plaintiffs to differentiate their allegations when suing more than one defendant . . . and

4   inform each defendant separately of the allegations surrounding [its] alleged participation in the

5   fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) (internal citations omitted).

6   "There is no flaw in a pleading, however, where collective allegations are used to describe the

7   actions of multiple defendants who are alleged to have engaged in precisely the same conduct."

8   *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016).

9              Here, defendants argue that plaintiffs' lumping together of defendants without distinction

10  fails to satisfy Rule 9(b).  (Doc. No. 13 at 24.); *see Swartz*, 476 F.3d at 764–65.  The court agrees

11  that it is unclear which allegations in plaintiffs' FAC describe the conduct of defendant TMS and

12  which describe the conduct of defendant TMNA, or whether all of plaintiffs' allegations are

13  intended to apply to each defendant.  Plaintiffs argue in their opposition to the pending motion

14  that they allege in their FAC that each defendant is responsible for the manufacture, distribution,

15  marketing, sales, and lease of the Class Vehicles, along with the development of marketing

16  materials.  (Doc. No. 17 at 17.)  However, at the December 5, 2023 hearing, plaintiffs' counsel

17  clarified that plaintiffs are not alleging that both defendants engaged in precisely the same

18  conduct, as the Ninth Circuit found was the case in its decision in *United Healthcare*, 848 F.3d at

19  1184.  Instead, plaintiffs' counsel both conceded that plaintiffs' FAC impermissibly lumped

20  defendants together and stated plaintiffs' intention to bring the claims sounding in fraud only

21  against defendant TMS in an anticipated second amended complaint.

22             Accordingly, defendants' motion to dismiss plaintiffs' claims sounding in fraud[6] will be

23  granted.

24  /////

25  /////

26

27  ————————————————

     [6]  That is, plaintiffs' CLRA claim, UCL claims for fraudulent and unfair practices, and unjust
28  enrichment claim seeking disgorgement of profits and injunctive relief enjoining defendants'
     alleged misleading business practices.

28

1          4.      UCL Claim (Unlawful Prong) (Claim 4)

2          The UCL unlawful prong "borrows violations of other laws and treats them as unlawful

3   practices that the [UCL] makes independently actionable." *AMN Healthcare, Inc. v. Aya*

4   *Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 950 (2018) (citations omitted).  "Virtually any

5   law—federal, state or local—can serve as a predicate for a [UCL] action."  *Id.*

6                  a.      *Whether Plaintiffs Sufficiently Allege Unlawful Conduct*

7          Defendants also argue that plaintiffs have failed to sufficiently allege unlawful practices in

8   violation of the UCL.  (Doc. No. 13 at 30.)  This argument fails because as discussed above,

9   plaintiffs have plausibly alleged breach of the Limited Warranty and breach of the implied

10  warranty of merchantability.  Therefore, the court finds that plaintiffs have likewise plausibly

11  alleged a violation of the unlawful prong of the UCL.  *See Enea*, 2019 WL 402315, at *7

12  ("Because the Court finds that Plaintiff has plausibly alleged a breach of implied warranty claim,

13  the Court also finds that Plaintiff has plausibly alleged a violation of the unlawful prong of the

14  UCL.").

15                 b.      *Whether Plaintiffs Allege an Inadequate Legal Remedy*

16         Next, defendants argue that all of plaintiffs' claims for equitable relief, including

17  plaintiffs' UCL unlawful conduct claim, must be dismissed because plaintiffs fail to allege an

18  inadequate legal remedy.  (Doc. No. 13 at 31.)  In support of their position, defendants cite the

19  Ninth Circuit's decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020),

20  in which the court held that a plaintiff "must establish that [they] lack[] an adequate remedy at

21  law before securing equitable restitution for past harm under the UCL and CLRA."  (Doc. No. 13

22  at 30–31) (quoting *Sonner*, 971 F.3d at 844); *see also Scheibe v. Fit Foods Distrib., Inc.*, No. 23-

23  cv-00220-JLS-AHG, 2023 WL 7434964, at *9 (S.D. Cal. Nov. 8, 2023) (stating that the Ninth

24  Circuit's decision in *Sonner* "unambiguously requires [plaintiffs], for each equitable claim [they]

25  assert[], to plead the basic requisites of the issuance of equitable relief under federal law—

26  including that [they] lack[] an adequate legal remedy—to survive a motion to dismiss") (citation

27  omitted).

28  /////

29

The UCL provides only for equitable remedies, so plaintiffs must allege an inadequate legal remedy to survive defendants' motion to dismiss their UCL unlawful conduct claim. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 n.2 (9th Cir. 2020). Plaintiffs fail to do so anywhere in their FAC. Accordingly, defendants' motion to dismiss plaintiffs' UCL unlawful conduct claim will be granted.

### 5.  Unjust Enrichment Claim For Injunctive Relief Compelling Repairs (Claim 2)

Plaintiffs seek injunctive relief compelling defendants to provide safety repairs, i.e., compelling defendants to repair the Defects free of charge, provide replacement Roofs, reform the Limited Warranty to cover the Defect, or replace the Class Vehicles with new vehicles. (*Id.* at 73, ¶ 158, 176–177.)[7] In their pending motion, defendants present three arguments in support of dismissal of the remaining part of plaintiffs' unjust enrichment claim: (1) plaintiffs lack standing to seek an injunction compelling defendants to provide safety repairs; (2) plaintiffs fail to allege an inadequate legal remedy; and (3) plaintiffs' unjust enrichment claim is barred by the Limited Warranty. For the reasons explained below, the court rejects each of these arguments.

#### a.  *Whether Plaintiffs Have Standing to Pursue Injunctive Relief*

To have Article III standing for injunctive relief, "the threat of injury must be actual and imminent, not conjectural or hypothetical." *Davidson v. Kimberley-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (internal citations omitted). "In other words, the threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient." *Id.* (internal citations omitted). "Past wrongs, though insufficient by themselves to grant standing, are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.* (internal citations omitted).

Defendants argue that plaintiffs lack standing to seek an injunction requiring safety repairs because plaintiffs allege no concrete and imminent risk of future injury stemming from the

---

[7]  The court has already concluded that plaintiffs' unjust enrichment claim seeking disgorgement of profits and injunctive relief enjoining defendants' alleged misleading business practices must be dismissed due to plaintiffs' lumping of the defendants together in violation of Rule 9(b). However, plaintiffs' unjust enrichment claim seeking injunctive relief compelling safety repairs does not sound in fraud and thus is not subject to Rule 9(b).

Defect.  (Doc. No. 13 at 32.)  However, two decisions cited by defendants purporting to show that plaintiffs face no such threat of future harm are easily distinguishable.  (*See id.*) (citing *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 19-cv-01298-JLS-KES, 2021 WL 62502, at *16 (C.D. Cal. Jan. 4, 2021); *Hoffman v. Ford Motor Co.*, No. 20-cv-00846-JLS-KES, 2021 WL 3265010, at *10 (C.D. Cal. Mar. 31, 2021)).  In *Sonneveldt*, the plaintiffs alleged they had already lost the use or possession of their vehicles, and in *Hoffman*, the car manufacturer had already provided remediation of the defect.  *See Sonneveldt*, 2021 WL 62502, at *16; *Hoffman*, 2021 WL 3265010, at *10.

Here, by contrast, plaintiffs allege in their FAC that they retain the use and possession of their Class Vehicles, and that defendants continue to "repair" Class Vehicles using the same defective Roof.  (Doc. No. 11 at ¶ 95.)  Consequently, plaintiffs allege, each Class Vehicle "continues to pose a safety risk and will continue to require future repairs and replacement parts at Class Vehicle owners' expense."  (*Id.* at ¶ 175.)  Indeed, plaintiff Gamez alleges that after her first Roof was repaired, her replacement Roof also exploded.  (*Id.* at ¶ 95.)

Because plaintiffs "still own their vehicles and allege they will be harmed by future attempted repairs," the court concludes that they have "sufficiently demonstrated that they are threatened with a concrete and particularized legal harm from future attempted repairs utilizing the same defective parts, and this injury is likely to occur again barring injunctive relief." *Goldstein v. General Motors LLC*, No. 19-cv-01778-LL-AHG, 2022 WL 484995, at *8 (S.D. Cal. Feb. 16, 2022).

   b.   *Whether Plaintiffs Have Failed to Allege an Inadequate Legal Remedy*

Defendants argue that plaintiffs' unjust enrichment claim seeking a safety repairs injunction must be dismissed because plaintiffs have failed to allege an inadequate legal remedy. (Doc. No. 20); *see also Sonner*, 971 F.3d at 844 (requiring plaintiffs to plead an inadequate legal remedy in order to receive equitable relief).

However, in support of their unjust enrichment claim, plaintiffs specifically allege that "[m]oney damages are not an adequate remedy for the above requested non-monetary injunctive relief."  (Doc. No. 11 at ¶ 158.)  Moreover, as discussed above, plaintiffs allege that they will

continue to be at ongoing risk of injury due to repairs utilizing the same defective Roofs.  (*See id.* at ¶¶ 95, 175.)  These allegations are "sufficient at this stage of the litigation."  *In re Natera Prenatal Testing Litig.*, 2023 WL 3370737, at *10 (N.D. Cal. 2023); *see also Kryzhanovskiy v. Amazon.com Servs., Inc.*, No. 2:21-cv-01292-DAD-BAM, 2022 WL 2345677, at *3–6 (E.D. Cal. June 29, 2022) (denying the defendants' motion to dismiss because the plaintiffs alleged that they were "being subjected to ongoing injury/harm for which there is no adequate remedy at law" and that "[d]amages will not fully redress such harms," such that "the court is unable to definitively conclude that plaintiff has an adequate remedy at law"); *Milstead v. Gen. Motors LLC*, No. 21-cv-06338-JST, 2023 WL 4410502, at *8 (N.D. Cal. July 6, 2023) ("Plaintiffs plead the absence of an adequate remedy at law, which is all that is required under *Sonner* at the pleadings stage."); *Plotts*, 2023 WL 4843342, at *12 (finding that the plaintiffs had alleged the lack of an adequate legal remedy since damages are retrospective and because "the injunction that Plaintiffs seek—to offer, under warranty, remediation solutions that [Honda] identifies and to provide Plaintiffs and class members with adequate repairs or with replacement components that do not contain the defects alleged herein—would redress the future harm that Plaintiffs face from the defect").

> c.      *Whether Plaintiffs' Unjust Enrichment Claim is Barred by the Limited Warranty*

Defendants argue that plaintiffs' unjust enrichment claim is barred by the Limited Warranty.  (Doc. No. 13 at 31–32); *see also Glenn v. Hyundai Motor Am.*, No. 15-cv-02052-DOC-KES, 2016 WL 7507766, at *5 (C.D. Cal. Nov. 21, 2016) ("Unjust enrichment cannot lie where a valid express contract covering the same subject matter exists between the parties.").

Plaintiffs do not appear to contest that the Limited Warranty is a valid express contract.  But as plaintiffs point out, defendants urge the court elsewhere in the pending motion to find that plaintiffs allege a design defect outside any coverage provided by the Limited Warranty.  (Doc. No. 17 at 29; *see also* Doc. No. 13 at 18 ("Plaintiffs have no claim under the Limited Warranty because it does not cover the design defect alleged.")).  Because plaintiffs allege in part a design defect, plaintiffs' unjust enrichment claim seeking a safety repairs injunction is not barred by the Limited Warranty.  *See Glenn*, 2016 WL 7507766, at *6 (denying the defendants' motion to

1    dismiss the plaintiffs' unjust enrichment claim because "[a]lthough the warranty covers defects in

2    material or factory workmanship, plaintiffs allege, in part, a defect in *design*, which is not

3    expressly covered by the warranty") (internal citations omitted).

4          Accordingly, defendants' motion to dismiss plaintiffs' unjust enrichment claim seeking an

5    injunction compelling defendants to provide safety repairs will be denied.[8]

6    **B.    Plaintiffs' Prayer for Relief**

7          Plaintiffs seek punitive damages only under the CLRA.  (Doc. No. 11 at ¶ 177.)  In their

8    pending motion, defendants argue that plaintiffs have failed to plead that defendants' officer,

9    director, or managing agent committed an act of oppression, fraud, or malice, as required by the

10   CLRA in order to receive punitive damages.  (Doc. No. 13 at 33.)  In their opposition to the

11   pending motion, plaintiffs contend that punitive damages are a remedy, not a claim, and therefore

12   provide no basis for dismissal under Rule 12(b)(6).  (Doc. No. 17 at 30.)  The court need not rule

13   on this issue because plaintiffs' CLRA claim has already been determined to be subject to

14   dismissal.[9]

15   /////

16   /////

_____

17   [8]  Defendants also briefly argue that plaintiffs' unjust enrichment claim should be dismissed as

18   duplicative of plaintiffs' other claims.  (Doc. No. 13 at 31.)  To the contrary, "Ninth Circuit law
     establishes that the duplicative nature of an unjust enrichment/quasi-contract claim is not a valid

19   reason to dismiss it."  *In re Natera*, 2023 WL 3370737, at 10 & n.12; *see also Astiana v. Hain
     Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("To the extent the district court concluded

20   that the [unjust enrichment] cause of action was nonsensical because it was duplicative of or
     superfluous to [the plaintiff's] other claims, this is not grounds for dismissal.").

21
     [9]  However, the court notes that many district court decisions in the Ninth Circuit "have held that

22   because a prayer for relief is a remedy and not a claim, a Rule 12(b)(6) motion to dismiss for

23   failure to state a claim is not a proper vehicle to challenge a plaintiff's prayer for punitive
     damages, because Rule 12(b)(6) only countenances dismissal for failure to state a claim."  *Elias v.*

24   *Navasartian*, No. 1:15-cv-01567-LJO-GSA-PC, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17,
     2017) (collecting cases), *adopted by Elias v. Navasartian*, No. 1:15-cv-01567-LJO-GSA-PC,

25   2017 WL 977793 (E.D. Cal. Mar. 13, 2017); *see also Kirchenberg v. Ainsworth, Pet Nutrition,*

26   *Inc.*, No. 2:20-cv-00690-KJM-DMC, 2022 WL 172315, at *6 (E.D. Cal. Jan. 19, 2022) (rejecting
     the defendants' argument that the plaintiff's "request for punitive damages should be dismissed

27   because [the plaintiff] does not allege oppression, fraud, or malice by an officer, director, or
     managing agent," because a "Rule 12(b)(6) motion to dismiss is not the appropriate vehicle to

28   challenge the sufficiency of a prayer for punitive damages") (internal citations omitted).

33

**C.     Leave to Amend**

Leave to amend should be granted "freely" when justice so requires.  Fed. R. Civ. P. 15(a).  The Ninth Circuit maintains a policy of "extreme liberality generally in favoring amendments to pleadings."  *Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406, 406 (9th Cir. 1960).  Reasons "such as undue delay, bad faith or dilatory motive . . .  repeated failure to cure deficiencies . . . undue prejudice to the opposing party . . . [or] futility" may support denial of leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  A district court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Servs.*, 911 F.2d 242, 247 (9th Cir. 1990).

As discussed above, plaintiffs' claims sounding in fraud[10] will be dismissed due to the plaintiffs lumping together of defendants in their FAC.  At the hearing on the pending motion, plaintiffs' counsel indicated an intent to name only defendant TMS as to such claims in a second amended complaint.  Leave to amend would therefore not be futile and will be granted as to these claims.

Plaintiffs' UCL unlawful conduct claim will be dismissed due to plaintiffs' failure to allege an inadequate legal remedy.  It is certainly imaginable that plaintiffs may be able to cure this deficiency with additional allegations.  Leave to amend will therefore be granted as to this claim as well.

**CONCLUSION**

For the reasons explained above,

1.     Defendant's motion to dismiss (Doc. No. 13) is granted in part and denied in part as follows:

a.     Defendants' motion to dismiss plaintiffs' express warranty claims arising under the Magnuson-Moss Warranty Act, the Song-Beverly Consumer

---

[10]  That is, plaintiffs' CLRA claim, UCL claims for fraudulent and unfair practices, and unjust enrichment claim seeking disgorgement of profits and injunctive relief enjoining defendants' alleged misleading business practices.

1    Warranty Act, and California Commercial Code § 2313 and brought

2    against defendant Toyota Motor North America is granted, with leave to

3    amend;

4    b.    Defendants' motion to dismiss plaintiffs' express warranty claims arising

5    under the Magnuson-Moss Warranty Act, the Song-Beverly Consumer

6    Warranty Act, and California Commercial Code § 2313 and brought

7    against defendant Toyota Motor Sales is denied;

8    c.    Defendants' motion to dismiss plaintiffs' implied warranty claims arising

9    under the Magnuson-Moss Warranty Act and the Song-Beverly Consumer

10    Warranty Act is denied;

11    d.    Defendants' motion to dismiss plaintiffs' California Consumer Legal

12    Remedies Act claim, Unfair Competition Law claim, and unjust

13    enrichment claim seeking disgorgement of profits and injunctive relief

14    enjoining defendants' alleged misleading business practices is granted,

15    with leave to amend;

16    e.    Defendants' motion to dismiss plaintiffs' unjust enrichment claim seeking

17    injunctive relief compelling defendants to repair the Defects free of charge,

18    provide replacement Roofs, reform the Limited Warranty to cover the

19    Defect, or replace the Class Vehicles with new vehicles is denied; and

20    2.    Within twenty-one (21) days from the date of entry of this order, plaintiffs shall

21    file either a second amended complaint, or a notice of their intent not to file a

22    second amended complaint and to proceed only on the claims found to be

23    cognizable in this order.

24    IT IS SO ORDERED.

25    Dated:   __January 5, 2024__

26    DALE A. DROZD
     UNITED STATES DISTRICT JUDGE

27

28